UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| LOUIS VIGNOLA, individually and as guardian ad litem on behalf of CAROLYN VIGNOLA AND GABRIEL VIGNOLA, and TAMARA HARLESS, Special Administrator on behalf of ESTATE OF NANCY MARIE OUELLET,<br><br>        Plaintiffs,<br><br>v.<br><br>CHARLES ALFRED GILMAN, JR.; AUTO-OWNERS INSURANCE COMPANY; AND MUTUAL OF ENUMCLAW INSURANCE COMPANY,<br><br>        Defendants. | 2:10-CV-02099-PMP-GWF<br><br>ORDER |

Presently before the Court is Plaintiffs' Motion for Summary Judgment (Doc. #137), filed on April 15, 2013. Defendant Auto-Owners Insurance Company filed an Opposition (Doc. #138) on May 9, 2013. Plaintiffs filed a Reply (Doc. #141) on May 23, 2013.

Also before the Court is Defendant Auto-Owners Insurance Company's Second Motion for Summary Judgment (Doc. #155), filed on June 19, 2013. Plaintiffs filed an Opposition (Doc. #167) on July 29, 2013. Defendant filed a Reply (Doc. #175) on August 15, 2013.

**I. BACKGROUND**

This case arises out of a June 22, 2010 automobile accident caused by Defendant Charles Gilman ("Gilman"), which resulted in the death of Nancy Ouellet ("Ouellet") and

the destruction of the motorcycle she was riding.  (Pls.' Mot. Summ. J. (Doc. #137) ["Pls.' MSJ"], Ex. 1; Stip. of Liability (Doc. #76).)  Plaintiffs are Ouellet's heirs and estate representative.  (Pet. for Removal (Doc. #1), Ex. A; Def.'s Second Mot. Summ. J. (Doc. #155) ["Def.'s MSJ"], Ex. A ["Hart Aff."], Ex. A-1.)

At the time of the accident, Ouellet was insured by Defendant Auto-Owners Insurance Company ("Auto-Owners").[1]  (Pls.' MSJ, Ex. 2.)  Ouellet's policy with Auto-Owners provided underinsured motorist ("UIM") coverage with limits of $500,000.  (Id.)

On July 7, 2010, Plaintiff Louis Vignola called insurance agent Patti Allison ("Allison"), who in turn called Auto-Owners, to report the loss.  (Pls.' MSJ, Ex. 5; Def.'s MSJ, Ex. C at 5.)  During the conversation with Auto-Owners, Allison referred to Louis Vignola as Ouellet's ex-husband, and indicated Louis Vignola would be the estate representative.  (Id.)  Auto-Owners' internal notes reflect that it was unclear from this conversation whether Louis Vignola's status as estate representative was official.  (Id.)  Auto-Owners then contacted Louis Vignola, who initially indicated he was Ouellet's ex-husband, but then stated he and Ouellet were still married in Canada, but were legally separated.  (Id.)  Louis Vignola further indicated he had two minor children with Ouellet, Plaintiffs Carolyn and Gabriel Vignola.  (Id.)  The written loss notice Auto-Owners received indicated that Louis Vignola was Ouellet's ex-husband at the time of her death.  (Def.'s MSJ, Ex. C-2.)

On July 13, 2010, Auto-Owners ordered a copy of the preliminary police report from the Nevada Highway Patrol.  (Def.'s MSJ, Ex. C at 5, Ex. C-1.)  On July 16, 2010, Auto-Owners received information that Ouellet's motorcycle was completely destroyed in the accident.  (Pls.' MSJ, Ex. 6.)  Because Ouellet insured the vehicle for $2,500 with a

---

[1] Defendant Auto-Owners states that the policy at issue in this case was issued by its subsidiary, Owners Insurance Company.  (Def.'s MSJ, Ex. B at 2.)

1  $1,000 deductible, Auto-Owners offered Louis Vignola $1,500 to settle property damage
2  under the policy. (Id.) Auto-Owners also requested Louis Vignola provide paperwork
3  establishing he was the representative of Ouellet's estate and a copy of the death certificate.
4  (Id.) On July 22, 2010, Auto-Owners received the death certificate, which indicated that
5  Ouellet was divorced at the time of her death. (Def.'s MSJ, Ex. C at 5, Ex. C-5.) That
6  same date, Louis Vignola sent Auto-Owners an "Automatic Oath Statement," which was
7  signed by a notary in Canada stating that Ouellet married Louis Vignola in 1990 and her
8  will designated Louis Vignola as liquidator of her estate. (Def.'s MSJ, Ex. C at 6, Ex. C-6.)

9  On July 30, 2010, Auto-Owners sought to obtain the police report for the
10 accident, but learned that the Nevada Highway Patrol usually does not complete reports
11 involving fatalities for ninety days. (Pls.' MSJ, Ex. 6.) A few days later, Auto-Owners
12 received a copy of the preliminary police report which described the accident as a head on
13 collision caused by Gilman pulling into Ouellet's lane of oncoming traffic while attempting
14 to pass another vehicle. (Pls.' MSJ, Ex. 8.) Auto-Owners then contacted Gilman's insurer
15 to confirm Gilman's liability and policy limits. (Id.) On August 8, 2010, Auto-Owners
16 offered to waive the $1,000 deductible on the motorcycle damage, and to settle that portion
17 of the claim for the policy limits of $2,500. (Def.'s MSJ, Ex. C-10.)

18 On August 9, 2010, Plaintiffs' counsel sent Auto-Owners a letter advising that
19 the law firm was representing Ouellet's heirs and estate, and offering to settle for the UIM
20 policy limits if paid within two weeks. (Pls.' MSJ, Ex. 9.) The letter acknowledged the
21 prior offer by Auto-Owners to settle the property damage to Ouellet's motorcycle for
22 $2,500, but Plaintiffs' counsel requested Auto-Owners confirm the policy limits for
23 property damage, as Ouellet's motorcycle was worth substantially more than $2,500. (Id.)

24 On August 20, 2010, Auto-Owners responded by providing the declarations page
25 from Ouellet's policy showing $500,000 UIM and $2,500 property damage limits. (Pls.'
26 MSJ, Ex. 10.) Auto-Owners declined to tender UIM policy limits, indicating that Auto-

3

Owners needed additional information, such as documentation establishing that Louis Vignola was the representative of Ouellet's estate; that Gilman was responsible for the accident; the limits of Gilman's liability insurance; whether Louis Vignola was still married to Ouellet at the time of her death; the age of Carolyn and Gabriel Vignola; and Ouellet's wage information. (Id.) Auto-Owners indicated it was seeking to obtain Ouellet's application for insurance to verify the $2,500 property damage limits. (Id.)

On August 20 and 23, 2010, Auto-Owners spoke with Gilman's insurer and requested information regarding the limits of Gilman's insurance policy and whether Gilman acknowledged liability. (Def.'s MSJ, Ex. C at 7.) Gilman's insurer declined to acknowledge liability at that point, and also declined to provide information regarding the limits of Gilman's insurance policy. (Id.) Gilman's insurer nevertheless indicated that Auto-Owners "most definitely" had underinsured motorist exposure. (Def.'s MSJ, Ex. C-1.) Auto-Owners thereafter investigated the extent of Gilman's assets beyond the insurance policy. (Def.'s MSJ, Ex. C at 8.) Auto-Owners determined the only other asset appeared to be a home worth $110,000. (Id.)

On September 2, 2010, Plaintiffs' counsel sent a letter to Auto-Owners stating that regardless of whether Louis Vignola was the estate's personal representative, counsel represented Ouellet's children who were her heirs. (Pls.' MSJ, Ex. 12.) Counsel expressed the view that Gilman's liability was clear. (Id.) Counsel also represented that Ouellet earned approximately $120,000 per year. (Id.) The next day, Gilman's insurer advised Auto-Owners that it had not yet made a liability determination, but the limit of Gilman's policy was $100,000. (Def.'s MSJ, Ex. C at 8.)

On September 7, 2010, Plaintiffs' counsel sent Auto-Owners a letter which included an attachment showing Gilman's limits of liability were $100,000 and a marriage certificate for Louis Vignola and Ouellet. (Hart Aff., Ex. A-3; Pls.' MSJ, Ex. 11.) The letter also provided the birth dates for Carolyn and Gabriel Vignola. (Hart Aff., Ex. A-3.)

4

Plaintiffs' counsel stated that payment of the UIM benefits was "overdue." (Id.) Auto-Owners left a message with Plaintiffs' counsel requesting documentation that Louis Vignola was the estate's representative. (Def.'s MSJ, Ex. C at 9.) The next day, Auto-Owners received what appeared to be a marriage certificate in French, which Auto-Owners sent to a translation service. (Pls.' MSJ, Ex. 11.) Auto-Owners then spoke with the officer investigating the accident, who stated that Gilman attempted to pass a truck by moving into Ouellet's lane of oncoming traffic. (Id.) On September 14, 21, and 23, 2010, Plaintiffs' counsel sent Auto-Owners three more letters claiming payment was overdue. (Hart Aff., Exs. A-4, A-5; Pls.' MSJ, Exs. 14, 15.) On September 21, 2010, Auto-Owners spoke with a witness to the accident who confirmed that Gilman had moved into Ouellet's lane to attempt to pass a vehicle and struck Ouellet head on. (Def.'s MSJ, Ex. C-1.)

On September 27, 2010, Gilman's insurer offered to settle Plaintiffs' claim against Gilman for the $100,000 policy limits for wrongful death under Gilman's policy. (Hart Aff., Ex. A-6.) Gilman's insurer also offered to pay $16,388.64 for property damage to the destroyed motorcycle. (Id.) Plaintiffs did not accept this offer. (Def.'s MSJ, Ex. H.) That same date, Auto-Owners initiated an investigation of court records in an attempt to verify Ouellet's marital status at the time of her death. (Def.'s MSJ, Ex. C at 10.) On September 28, 2010, Plaintiffs' counsel sent another letter to Auto-Owners expressing surprise at Auto-Owners' lack of response to prior correspondence and failure to pay the policy limits. (Pls.' MSJ, Ex. 14.) That same date, the investigator indicated to Auto-Owners that he had checked United States records and could find no record of a divorce, but he was still checking in Canada. (Def.'s MSJ, Ex. C-30.)

On September 29, 2010, Auto-Owners responded to Plaintiffs' counsels' prior letters demanding payment of the UIM benefits. (Pls.' MSJ, Ex. 15.) Auto-Owners acknowledged receiving proof of Gilman's limits of liability and confirmed that Ouellet's policy insured only $2,500 in property damage. (Id.) Auto-Owners thus offered to settle

5

1  the property damage claim for $2,500.  (Id.)

2  Auto-Owners also indicated that it needed to determine who was entitled to
3  payments of any coverage under Ouellet's policy once UIM benefits were triggered.  (Id.)
4  However, Auto-Owners denied it delayed payment in this matter, stating that UIM benefits
5  had not yet been triggered because Gilman's liability limits had not been exhausted by
6  judgment or settlement.  (Id.)  Auto-Owners cited to section 2.e of the Uninsured Motorist
7  Coverage endorsement to Ouellet's policy, which reads as follows:

> With regard to an underinsured automobile, there is no coverage under this endorsement until the limits of liability of all bodily injury liability bonds and insurance policies applying to the underinsured automobile and its operator have been exhausted by payment of judgments or settlements.

11  (Id.; see also Pls.' MSJ, Ex. 3.)

12  Auto-Owners also reiterated that it needed to determine who had authority to act
13  on behalf of Ouellet's estate and her children to ensure payment to the proper parties once
14  the UIM benefits were triggered.  (Pls.' MSJ, Ex. 15.)  Auto-Owners indicated it could not
15  rely on the Canadian Automatic Oath Statement designating Louis Vignola as the
16  representative of Ouellet's estate because Auto-Owners could not be sure of the statement's
17  authenticity or its applicability in the United States.  (Id.)  Auto-Owners thus requested
18  proof as to the court-appointed personal representative of Ouellet's estate and court
19  approval of any guardian or settlement authority for Ouellet's children.  (Id.)  Auto-Owners
20  also requested clarification as to whether Ouellet and Louis Vignola were still married at
21  the time of the accident, as Louis Vignola had described himself as Ouellet's ex-husband
22  and the death certificate indicated Ouellet was divorced.  (Id.)  Auto-Owners also asked for
23  documentation substantiating Ouellet's wages.  (Id.)

24  On October 5, 2010, Plaintiffs' counsel responded and requested a copy of the
25  entire policy, rather than excerpted provisions. (Hart Aff., Ex. A-8.)  Counsel also indicated
26  they already had provided the marriage certificate, death certificate, and Automatic Oath

1  Statement.  (Id.)  Counsel contended this information was sufficient to evaluate the claim,
2  but requested further direction if more information was needed.  (Id.)
3      Auto-Owners responded on October 13, 2010, indicating that if Ouellet was
4  making approximately $120,000 as Plaintiffs' counsel previously had represented, then the
5  UIM policy limits would be implicated.  (Pls.' MSJ, Ex. 16.)  Auto-Owners thus requested
6  documentation of Ouellet's wages.  (Id.)  Auto-Owners again asserted that UIM benefits
7  were not triggered under Ouellet's policy unless and until Gilman's liability limits were
8  exhausted through judgment or settlement.  (Id.)  Auto-Owners indicated that the only issue
9  that would remain once UIM coverage was triggered was to whom benefits should be paid,
10 an issue that was unclear given uncertainty about Ouellet's marital status, who was the
11 estate's personal representative, and who had settlement authority for the children.  (Id.)
12     October 20, 2010, Plaintiffs' counsel sent a letter to Auto-Owners disputing that
13 Auto-Owners could withhold payment until Plaintiffs settled or obtained judgment against
14 Gilman, contending that could take years to accomplish.  (Hart Aff., Ex. A-8.)  Counsel also
15 suggested that Auto-Owners was insisting on irrelevant documentation, as the identity of
16 the proper recipients could be resolved through court action.  (Id.)  On October 22, 2010,
17 Gilman's insurer advised Auto-Owners that it had accepted liability and tendered the policy
18 limits to Plaintiffs.  (Def.'s MSJ, Ex. C-1.)  On October 28, 2010, Auto-Owners sent
19 another letter again requesting information concerning whether Louis Vignola had the right
20 to compromise the children's claims, whether Louis Vignola was married to Ouellet at the
21 time of her death, who was the representative of Ouellet's estate, and documentation of
22 Ouellet's wages.  (Pls.' MSJ, Ex. 25.)
23     On November 2, 2010, Plaintiffs' counsel offered to provide a compromise of the
24 minor children's claims and releases from "all appropriate parties."  (Pls.' MSJ, Ex. 17.)
25 Counsel also provided a copy of the Complaint it filed against Auto-Owners in this action
26 of the same date.  (Id.; Pet. for Removal (Doc. #1), Ex. A.)  Auto-Owners responded a few

7

days later, again requesting documentation of Ouellet's wages and documentation that Plaintiffs had settled or obtained a judgment against Gilman. (Pls.' MSJ, Ex. 18.) Auto-Owners indicated it also might be necessary to have a court determine who was entitled to the insurance proceeds as Plaintiffs previously had suggested. (Id.) On November 19, 2010, Plaintiffs' counsel sent another letter to Auto-Owners reiterating that it believed Auto-Owners was acting unreasonably, and providing documentation of Ouellet's wages. (Pls.' MSJ, Ex. 19.) On December 6, 2010, Auto-Owners sent a letter to Plaintiffs' counsel indicating Auto-Owners was prepared to tender the $500,000 limits "upon confirmation that the proceeds will go to the appropriate heirs." (Pls.' MSJ, Ex. 20.) Auto-Owners indicated it still was unsure whether Louis Vignola was married to Ouellet at the time of her death, and Auto-Owners requested a copy of the court order appointing Plaintiff Tamara Harless as the special administrator for Ouellet's estate as indicated in the Complaint. (Id.)

From September to December 2011, the parties exchanged letters in which they continued to dispute the promptness of Auto-Owners' response and the completeness of information provided by Plaintiffs' counsel. (Pls.' MSJ, Exs. 21-22.) Ultimately, the parties agreed Auto-Owners would pay $250,000 each to Carolyn and Gabriel Vignola, and Louis Vignola would release any claim he had to the proceeds. (Pls.' MSJ, Ex. 22.) Louis, Carolyn, and Gabriel Vignola agreed that payment of the $500,000 underinsured motorist benefits satisfied all of their claims for UIM coverage under the policy. (Def.'s MSJ, Ex. B, Attach. A-1 at 2.) However, the settlement agreement "in no way negatively affects the ongoing claims by Carolyn, Gabriel and Louis Vignola against Auto-Owners for common law and statutory bad faith, and any damages arising from those claims over and above the policy limits including but not limited to interest, attorneys fees, consequential damages, punitive damages or any other claims other than the claim to have the policy limits paid." (Id.) Auto-Owners paid the $500,000 UIM policy limits to Carolyn and Gabriel Vignola on January 23, 2012. (Hart Aff. at 3.)

Plaintiffs now move for summary judgment, arguing no genuine issue of material fact remains that Auto-Owners acted in bad faith and violated Colorado claims practices law by refusing to tender the UIM limits and by requiring Plaintiffs to provide redundant and unnecessary information. Plaintiffs contend Auto-Owners' delay in payment based on its investigation of who could pursue the claim was in bad faith because "the wrongful death claim is derivative and representative, [and] whichever heir pursues the claim holds the funds in trust for all rightful heirs." (Pls.' MSJ at 29.) Plaintiffs also argue Auto-Owners acted in bad faith by relying on outdated law and an unconscionable policy provision which purports to delay the triggering of UIM benefits until the limits of the tortfeasor's policy are satisfied through judgment or settlement. Plaintiffs further contend Auto-Owners' reliance on this policy provision constitutes a breach of contract.

Auto-Owners responds and cross-moves for summary judgment, arguing certain exhibits supporting Plaintiffs' Motion are not authenticated. On the merits, Auto-Owners argues no breach of contract claim remains in this case because Plaintiffs settled that claim when Auto-Owners paid the $500,000. As to the bad faith and statutory claims, Auto-Owners contends Plaintiffs failed to meet their evidentiary burden by providing proof of objective industry standards. Auto-Owners also argues it did not act unreasonably because Plaintiffs never submitted a complete and valid claim before filing suit where questions remained regarding Ouellet's marital status and Louis Vignola's status as estate representative. Auto-Owners further contends its position that the UIM benefits were not triggered until the tortfeasor's limits were satisfied through judgment or settlement was fairly debatable, and therefore Auto-Owners did not act unreasonably by delaying payment until Gilman's policy limits were exhausted through judgment or settlement.

**II. MOTIONS FOR SUMMARY JUDGMENT**

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any

9

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002). Initially, the moving party bears the burden of proving there is no genuine issue of material fact. Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002). After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial. Id. The Court views all evidence in the light most favorable to the non-moving party. Id. The Court considers only admissible evidence in ruling on a summary judgment motion, and "[a]uthentication is a condition precedent to admissibility." Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002) (quotation omitted); Fed. R. Civ. P. 56(c).

       Claims for breach of an insurance contract may arise where an insurer delays or refuses to make payment owed directly to its insured under a first-party insurance policy. Goodson v. Am. Standard Ins. Co. of Wis., 89 P.3d 409, 414 (Colo. 2004). Colorado law implies a covenant of good faith and fair dealing into every insurance contract. Sanderson v. Am. Family Mut. Ins. Co., 251 P.3d 1213, 1217 (Colo. Ct. App. 2010). An insurer's denial of a valid claim constitutes common law bad faith if the plaintiff can show the insurer's conduct is unreasonable under the circumstances and the insurer knew or recklessly disregarded the fact that its conduct was unreasonable. Herod v. Colo. Farm Bureau Mut. Ins. Co., 928 P.2d 834, 835-36 (Colo. Ct. App. 1996). Common law bad faith "may encompass an entire course of conduct and can be cumulative." Vaccaro v. Am. Family Ins. Grp., 275 P.3d 750, 756 (Colo. Ct. App. 2012). Colorado also provides a separate statutory claim against an insurer who unreasonably delays or denies payment of a claim. Colo. Rev. Stat. §§ 10-3-1115(1)(a), 10-3-1116(1); Vaccaro, 275 P.3d at 756. To

establish a statutory violation under § 10-3-1115(1)(a), the insured need establish only that the insurer delayed or denied payment without a reasonable basis. Kisselman v. Am. Family Mut. Ins. Co., 292 P.3d 964, 973-74 (Colo. Ct. App. 2011) (discussing the difference between common law and statutory bad faith under § 10-3-1115).

### A. Breach of Contract

No genuine issue of material fact remains that Plaintiffs settled their breach of contract claim. Pursuant to the settlement agreement, Louis, Carolyn, and Gabriel Vignola agreed that payment of the $500,000 underinsured motorist benefits satisfied all of their claims for UIM coverage under the policy. (Def.'s MSJ, Ex. B, Attach. A-1 at 2.) The settlement agreement provided that the settlement "in no way negatively affects the ongoing claims by Carolyn, Gabriel and Louis Vignola against Auto-Owners for common law and statutory bad faith, and any damages arising from those claims over and above the policy limits including but not limited to interest, attorneys fees, consequential damages, punitive damages or any other claims other than the claim to have the policy limits paid." (Id.) By the settlement agreement's plain and unambiguous terms, Plaintiffs reserved only their common law and statutory bad faith claims and any damages arising from those claims. See O'Neil v. Wolpoff & Abramson, L.L.P., 210 P.3d 482, 484 (Colo. Ct. App. 2009) (stating settlement agreements are contracts and unambiguous contractual language controls). As for Plaintiffs' argument that there was no consideration for the settlement because Auto-Owners already owed the $500,000, settlement of a disputed claim suffices as consideration to support a contract. Tisdel v. Central Sav. Bank & Trust Co., 6 P.2d 912, 919 (Colo. 1931). The Court therefore will grant Defendant's Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment on Plaintiffs' breach of contract claim.

///
///
///

### B. Statutory and Common Law Bad Faith

#### 1. Objections to Exhibits

Auto-Owners objects to exhibits 1-8, 11, and 13 attached to Plaintiffs' Motion for Summary Judgment for failure to authenticate these exhibits. Plaintiffs respond that exhibit 1 is an official public record and in any event, Auto-Owners introduced this same exhibit in support of a prior filing and therefore conceded its authenticity. Plaintiffs argue exhibits 2-4 were produced by Auto-Owners in discovery and Auto-Owners introduced these exhibits in a prior filing. Plaintiffs contend exhibits 5, 6, 8, 11, and 13 were produced in discovery by Auto-Owners. Finally, Plaintiffs contend exhibit 7 is self-authenticated as a sworn document.

Because Auto-Owners produced exhibits 1-6, 8, 11, and 13 in discovery or introduced and authenticated these same exhibits in support of its own filings,[2] the Court will overrule Auto-Owners' objections based on authentication. See Orr, 285 F.3d at 776-77 & n.20. As to the Automatic Oath Statement offered as Plaintiffs' exhibit 7, the statement is signed by a person who purports to be authorized to make the statement under "automatic oath" in Canada. Although not accompanied by a final certification as to the genuineness of the signature and official position of the signer, Auto-Owners has had sufficient opportunity to investigate the document's authenticity and Auto-Owners objects only to authentication, not actual authenticity. The Court will allow exhibit 7 into evidence. See Fed. R. Evid. 902(3). Further, Auto-Owners attached the same document to its Motion for Summary Judgment as the Automatic Oath Statement that Louis Vignola emailed to Auto-Owners. (Def.'s MSJ, Ex. C at ¶ 24, Ex. C-6.) Throughout the claims process and this lawsuit, Auto-Owners did not dispute the authenticity of the document; rather, it disputed the significance of the document in establishing Louis Vignola's status as

---

[2] (See Def.'s Mot. to Determine Applicable Law (Doc. #61); Def.'s Opp'n to Pls.' Mot. Summ. J. (Doc. #105); Def.'s MSJ.)

Ouellet's husband and representative of Ouellet's estate. The Court therefore will overrule Auto-Owners' objection to exhibit 7.

### 2. Expert Testimony

Auto-Owners contends the Court must deny Plaintiffs' Motion because Plaintiffs failed to present expert testimony on industry standards to establish Auto-Owners acted unreasonably. Under Colorado law, the reasonableness of the insurer's conduct is determined "objectively, based on proof of industry standards," and "[t]he aid of expert witnesses is often required in order to establish objective evidence of industry standards." Goodson, 89 P.3d at 415. However, an expert is not required as a matter of law in insurance bad faith lawsuits. Am. Family Mut. Ins. Co. v. Allen, 102 P.3d 333, 343-44 (Colo. 2004) (en banc). Expert testimony is not required where the applicable standard of care "does not require specialized or technical knowledge," or where "a legislative enactment or administrative rule establishes the standard of care." Id. at 343. Whether the standard of care is within the knowledge of an average juror lies within Court's discretion. Id. at 344. As the Colorado Supreme Court concluded in Allen, the Court likewise concludes, in its discretion, that the reasonableness of Auto-Owners' explanation for delaying payment on Plaintiffs' claim does not require special knowledge or training. Id. at 344-45. Moreover, the Unfair Claims Practices Act and insurance regulations constitute objective evidence of the relevant industry standards. Id. The Court therefore declines to deny Plaintiffs' Motion on the basis that Plaintiffs failed to present expert testimony in support.

### 3. Bad Faith

Viewing the evidence in the light most favorable to Auto-Owners in response to Plaintiffs' Motion for Summary Judgment, genuine issues of fact remain as to whether Auto-Owners reasonably delayed payment on the UIM claim. A reasonable jury could find Auto-Owners reasonably delayed payment because Plaintiffs failed to submit a complete

claim and questions remained which required investigation. (Def.'s MSJ, Ex D at 5, Ex. I at § 4.A.2.a-b.) Specifically, a reasonable jury could find Auto-Owners reasonably delayed payment while it sought to determine the proper recipients of the proceeds.

Further, a reasonable jury could find Auto-Owners' reliance on the policy provision requiring exhaustion of the tortfeasor's limits of liability through settlement or judgment was reasonable, even if mistaken. Following this Court's prior Order (Doc. #123) finding the exhaustion provision void and unenforceable, the Colorado Court of Appeals issued an opinion agreeing with this Court that the amendments to Colorado's UIM statutory scheme plainly and unambiguously provide that the "insurer's obligation to pay benefits is now triggered by exhaustion of the tortfeasor's 'limits of . . . legal liability coverage,' not necessarily any payment from or judgment against the tortfeasor." Jordan v. Safeco Ins. Co. of Am., Inc., --- P.3d ----, 2013 WL 1240872, at *5 (Colo. Ct. App. Mar. 28, 2013). However, the Jordan court declined to address whether exhaustion clauses such as the one Auto-Owners relies on are unenforceable as against public policy. Id. at 6 n.7. The Jordan court noted that some jurisdictions hold such clauses are unenforceable, while others uphold the exhaustion clauses. Id. This Court has ruled the clause unenforceable, but a reasonable jury could find that Auto-Owners' reliance on the clause was not unreasonable given the fact that at the time Auto-Owners made its decision, neither this Court nor any Colorado court had declared exhaustion clauses unenforceable, and at least some other jurisdictions upheld the clauses. A reasonable jury thus could find Auto-Owners' position was fairly debatable. See Vaccaro, 275 P.3d at 759. The Court therefore will deny Plaintiffs' Motion for Summary Judgment on the statutory and common law bad faith claims.

Viewing the evidence in the light most favorable to Plaintiffs on Auto-Owners' Motion for Summary Judgment, a reasonable jury could find Auto-Owners' reliance on the exhaustion clause was in bad faith. Even if Auto-Owners' position on the exhaustion clause

was fairly debatable, that alone does not entitle Auto-Owners to judgment as a matter of law on a bad faith claim.  Sanderson, 251 P.3d at 1217-18.  Rather, "fair debatability is a necessary condition to avoid a claim of bad faith, [but] it is not always a sufficient condition."  Id. at 1219 (quotation omitted).  Given the Colorado UIM statute's plain and unambiguous language, and other jurisdictions which had held exhaustion clauses unenforceable as against public policy, a reasonable jury could find Auto-Owners' reliance on the exhaustion clause was unreasonable and Auto-Owners recklessly disregarded the clause's unenforceability.

Additionally, genuine issues of fact remain as to whether Auto-Owners acted reasonably in investigating Plaintiffs' claim and delaying payment based on a determination of the proper recipients.  As to the question of whether Louis Vignola was Ouellet's spouse at the time of death, Plaintiffs advised Auto-Owners that Louis Vignola was the spouse, Plaintiffs provided the marriage certificate, and Auto-Owners' own investigation produced no evidence of a divorce.  Although Auto-Owners repeatedly requested Louis Vignola to verify the marital status, Auto-Owners did not advise what evidence it would accept as proof no divorce had occurred beyond what already had been provided.  (Def.'s MSJ, Ex. C-12, C-32, C-34 at AUTO00011, AUTO00174; Pls.' MSJ, Exs. 18, 20.)  A reasonable jury could find Auto-Owners unreasonably delayed payment on this basis by not accepting Plaintiffs' representation and evidence or the results of Auto-Owners' own investigation while requiring Louis Vignola to prove a negative without advising specifically what evidence Auto-Owners would accept as satisfactory.

As to the estate representative, Tamara Harless was identified as the estate representative in the Complaint.  Although Auto-Owners contends its duty to negotiate was suspended upon the filing of the Complaint, Auto-Owners cites no authority for the proposition that its duty to investigate was suspended.  Further, Auto-Owners' duty to negotiate as evidence of good faith may be suspended only for so long as there remained a

genuine dispute over the amount due under the insurance policy.  See Vaccaro, 275 P.3d at 759; Bucholtz v. Safeco Ins. Co. of Am., 773 P.2d 590, 592-93 (Colo. Ct. App. 1988); see also Rabin v. Fid. Nat'l Prop. & Cas. Ins. Co., 863 F. Supp. 2d 1107, 1113 (D. Colo. 2012) (stating duty to negotiate as a sign of good faith may be suspended if "(1) an adversarial proceeding is filed, and (2) a genuine disagreement as to the amount of compensable damages exists").  A reasonable jury could find Auto-Owners unreasonably delayed payment after the estate representative had been identified because Auto-Owners could have investigated Harless's status as estate representative and no genuine dispute over this issue would have remained.

Moreover, on October 20, 2010, before filing suit, Plaintiffs had suggested a court may need to resolve the issue of the proper recipients, and after filing suit, Plaintiffs offered to provide Auto-Owners "appropriate settlement documents such as compromise of a minor's claim and releases from all appropriate parties," rather than continue to delay payment on the basis that Auto-Owners could not determine the proper recipients.  (Pls.' MSJ, Ex. 17; Hart Aff., Ex. A-8.)  A reasonable jury could find Auto-Owners knew or recklessly disregarded the unreasonable nature of continuing to delay payment on this basis, assuming a jury finds it unreasonable, because Auto-Owners acknowledged Plaintiffs' offer and also acknowledged the possibility of having a court determine the proper recipients.  (Pls.' MSJ, Ex. 18.)  Plaintiffs responded by offering to have the funds distributed through the estate but Auto-Owners did not take any action, such as interpleading the funds.  (Pls.' MSJ, Ex. 19.)  Instead, Auto-Owners continued to withhold payment until the settlement agreement a little over a year later.  The Court therefore will deny Auto-Owners' Motion for Summary Judgment on the statutory and common law bad faith claims.

### C. Joint Pretrial Order and Settlement Conference

The parties shall file a proposed joint pretrial order on or before January 17, 2014, so the Court may set this matter for trial.  Additionally, the Court will refer this matter

to Magistrate Judge Foley for a settlement conference.

**IV. CONCLUSION**

      IT IS THEREFORE ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. #137) is hereby DENIED.

      IT IS FURTHER ORDERED that Defendant Auto-Owners Insurance Company's Second Motion for Summary Judgment (Doc. #155) is hereby GRANTED in part and DENIED in part. The Motion is granted as to Plaintiffs' breach of contract claim. The Motion is denied in all other respects.

      IT IS FURTHER ORDERED that this matter is referred to Magistrate Judge Foley for a settlement conference.

      IT IS FURTHER ORDERED that the parties shall submit a proposed joint pretrial order on or before January 17, 2014.

DATED: December 17, 2013

                                                               PHILIP M. PRO
                                                               United States District Judge